My name is Spencer Nathan Thal. I'm appearing on behalf of the appellant plaintiff, Teamsters Local 117. Good morning. May it please the Court, Your Honors. Thank you for the opportunity to argue this important case. This case tests our commitment to the principle that was enacted 50 years ago by Congress in the Civil Rights Act that sex discrimination in employment is unlawful and wrong in all its forms and for virtually every reason. Unless there's a bona fide occupational qualification. So doesn't this case turn on whether or not the exemption applies? My next sentence that I'd issue in this case is the one narrowly crafted exception to the statutory prohibition known as the BFOQ exception. Where would we find in the record any evidence that the union has an individual qualified and prepared to take one of these positions? You're asking me to switch over to the standing question? Well, that is a threshold question. I'm not asking you a question. I'd like an answer. Of course. So the evidence in the record regarding from the testimony of Mr. Douglas Cole and also from Eldon Vail regarding the injuries that officers sustained was the threshold evidence. But most critically, this court's decision in Lobb makes it clear that when standing is raised for the first time on appeal, the court looks first to the complaint. And if the complaint contains allegations of injury, that is sufficient to establish standing. Now, I know that may not address your questions relative to damages on the underlying motion for summary judgment. But with respect to standing, it seems to me that Lobb disposes of that issue on its face just with respect to the complaint. I understand you have a legal argument. I'll repeat my question. Where would I find in the record any indication or name of a member of the Teamsters Local who is ready, willing, able, and qualified to take one of the contested positions? Zalatino and Laboon, as identified in the testimony of Douglas Cole. And that would be found at ER 630 through 631 and 639 through 641. It's also cited in our brief. And what was the nature of their injury? So, Laboon, as the affidavit from Laboon further clarifies, lost career advancement. Zalatino and Laboon both were displaced from their positions. You also now, of course, have Are those affidavits submitted on appeal or are you talking about the record that was for the district court? In this case, those, I'm talking about the record underneath. You're also now, in terms of the affidavits on appeal, you have Phillip Hainan, Michael Jones, who were displaced from their employment, went and found, had to find jobs on the east, one of them went to find a job on the east side of the state, clearly had a financial impact and a loss. In the hopes of So your argument would be, although they did find similar work for him within the Department of Corrections, the injury came from having to incur the cost of moving to eastern Washington? Certainly. If you look at the affidavits of those individuals, you'll see substantial economic and personal impacts. I mean, there's no question that the affidavits establish that. But in terms of answering this judge's question about the Judge Hawkins. Judge Hawkins' question about the, on the record below, the testimony of Douglas Cole is what you have before you. There are no, there were no declarations submitted at that time. And candidly, that's because the issue of damages was raised only very quickly at the end of the department's brief and was not thoroughly and significantly raised at that time. It became a much larger issue on appeal, as you know, with respect to the standing issue. Now, I want to emphasize from the outset, with respect to the substantive issue in this case, that Teamsters Local 117 and its members are completely committed to do all that is necessary to ensure that female inmates at the women's prisons are not subject to sexual predation  And it's for that reason that the union acknowledged many BFOQ female only positions as necessary and appropriate in certain circumstances. For example, we've conceded the response and movement officer positions, which are necessary to ensure adequate female staff to conduct pat searches during movement periods. We've also conceded certain housing unit positions, hospital watch positions, and so forth. The question presented in this case is not whether DOC is permitted to make such necessary designations, but whether the department is permitted to go beyond that which is necessary and in the name of protecting female inmates from sexual assault and predation, designate positions as BFOQ female only, not on the basis of evidence, but on the basis of instinct, hunch, or stereotype. Well, they did more than that, though, did they not? They hired outside consultants, either retired or other prison officials from out of state, to come in and examine the operations. And then they asked the Washington Human Rights Commission to conduct an investigation. And this, I guess, all arose after they were sued in a class action, which established a history of improprieties and sexual misconduct. Yes, Your Honor. The Department of Corrections saw that it had a very serious problem. And you're not quarreling with the identification of the problem. You're quarreling, as I understand your argument, they went too far. Exactly. This was a very serious problem. They did study it. One interesting point that I'd like to direct your attention to that I think is important in response to your question is found on ER 727, which is the one place where you find the notion in the expert testimony of having a single female officer when there are two or more positions, having the first female officer in the housing unit. And this is where we get to the essence of the fundamental problem in this case, which is that the department made that decision not on the basis of the kind of evidence that's demanded by this court in Ambatt and Briner, but on the basis of hunch and instinct. Well, I thought the justification was to the extent that we might have either one or two correctional officers on duty in a housing unit, one of them had to be female. And if you had a mixed pair, that the presence of the female correctional officer might help minimize the kinds of problems that had led us to this place. That's exactly right. And what we're saying is that there isn't evidence to support that hunch, which is based on a stereotype that... Well, wasn't that examined by the outside consultants and the Human Rights Commission? No. I mean, they looked at those positions, did they not? No, there's no evidence in the record to support that assertion. It's an assertion that somehow women are better at policing men's sexual predatory nature. But it's more than that, isn't it, counsel? We want a female correctional officer present in a housing unit because the potential alcohol and privacy violations are more likely to occur in that unit because of the changing clothes and going to bed, showering, toileting, all that sort of thing. So if that's legitimate, let's suppose that the... Was this the opinion of the head of corrections that you're challenging as to why we need a mixed team? Well, certainly Eldon Vail, his testimony makes it very clear that he was making that on the basis of instinct. There's numerous citations of the record which I can go through. Okay, but instinct plus, I guess, is my question. If there's a legitimate justification for having a female correctional officer for those reasons, are you saying we invalidate the director's conclusion that it's also helpful in minimizing, I'll call them adverse contacts? Privacy issues. So five responses. First of all, that absolutely was not the department's reason at the time. Please go back and review the record and all the citations there. I don't have time to run through them now. But the correctional, the outside consultants talked about the importance in those more intimate locations in the prison. But when you look at the record and when Eldon Vail was asked the question, what was the rationale for this rule in the housing units? His answer was not about that. It was about their belief that it would be safer because the female would do a better job. That stereotype probably... At the time he was deposed, I assume he'd received and read the report of the consultants in the Human Rights Commission, had he not? Yes. So why can't we look at that as also evidence to support his decision? I'm saying first that it wasn't the rationale for the decision. But if you look beyond that, it's not intellectually consistent because men are currently on the housing units working in there without restriction as to duties. Well, he's not saying that they can't be there at all. Without restriction as to duties. What he's saying is what I don't want is to have males only in a housing unit at night. And it seems to me that the consultant reports in the Human Rights Commission investigation and the basis for the class action is pretty darn clear that that was what led to the problems in the first place. To be clear, it isn't just at night. Well, I understand. I mean, we're talking transport. We're talking hospital guards. I mean, in the housing units at all times. Yeah, I understand that. But, I mean, isn't the problem having unsupervised male correctional officers in situations with female inmates where either the officer can be compromised because of false complaints of sexual misconduct or there are opportunities for sexual misconduct that we don't want to, I hate to use the word facilitate, but that are easier to go undetected if we have only male officers present? I recognize that that concern applies equally as between men and women. Both men and women are capable of that. Right, but didn't the evidence in the record show that the majority of the, I'll call them incidents, were male correctional officers and female inmates? Yes, Your Honor, but that is not the test. The test in AMBAT is, first of all, whether sex is a legitimate proxy for the qualification because the department has a substantial basis for believing that all or nearly all men lack the qualification. What is the qualification? The qualification here is the ability to refrain from sexual abuse and predation and to monitor and report others who engage in that kind of conduct. Okay, I'd like to change gears just a little bit.  I see that. Let me go back to the standing issue because you tried to slip by that quickly, and I just want to make sure I understood you clearly. Were you saying at page 630, Mr. Cole's deposition testimony, is where we see the specific officers that are identified? It's what I have in my notes. If that's not correct, I can get you to it, but I'd actually like to do that on the little time I have in rebuttal so I can get it. No, I'd like to hear it now because the threshold issue is standing, and you're here. You've put in supplemental. I mean, I read pages 630, 633, and I see basically a talk about a certain number, six officers. I don't see names. There was documents that weren't admitted into the district court record, so I'm really trying to understand the facts, which are important. And if there is such a person, I just want to know where they're named and what their status was because even on your supplemental declarations, for example, I note that one of these individuals is unemployed, Mr. Hanen, and I think the other one's in a different prison. So I'm just trying to match the people with the claims, if you can help me. Yes. Thank you. Okay. Okay. So at page 13 through 16 of our brief, our opening brief, ER-536 is Eldon Bales' testimony, and ER- What does he say? He identifies that the BFOQ positions disrupted the work schedules of employees, and then at 630- Unnamed correctional officers. Okay. At ER-639 through 641, there were correctional officers. This was the citation that I was referring to in Laboon and Salatino, that they lost positions at WCCW to female officers with substantially less seniority, and that references the McNeil Island closure that led to the displacement of the female officers. Does that have any names? I see a number of places where there are general allegations, and I credit those, but what I'm looking for is even a single person who falls in this category. Laboon and Rudy Salatino were the individuals who were identified as to specific members, and I have that as ER-630 to 641. I don't see that, though. Maybe that's why I'm just looking here. I think Doug Cole was referring to an Exhibit 20 in his deposition testimony. What does Exhibit 20? Was that part of the record before the district court? The reason I'm asking is that the case has a lot of similarities to the Associated General case out of this court just a year ago, so I'm trying to see if your case is different in some way and has satisfied something differently. I'm reading these, and I'll go back and read them again, but as I was reading 630 to 639 and these others, we were looking at, in the testimony, unidentified people. We were saying officers this, officers that. So if you have additional specific citations you want to point us to, the clerk does have a little piece of paper for supplemental citations, and just so you give the other side, you can do that at the conclusion of the argument. Mr. Thalby, before you sit down, I just want to clarify, the closure on McNeil Island was a men's prison, was it not? Yes, that's correct. Right, so there were correctional officers displaced for reasons having nothing to do with this issue that brings us here today. Of course, the point being that those male correctional officers would not have been displaced but for the BFOQ positions because they had seniority to avoid displacement, but for positions being unavailable to them at WCCW. I understand that, but I guess what I'm questioning is nexus here, that they lost the position because it was uneconomical for the state to continue operating what used to be the old federal prison on McNeil, which is the reason that the feds abandoned it. So how can you link that injury to the bona fide occupation exception? Well, I don't think that's disputed, that if the BFOQ positions had not been as extensive, there would have been additional options at PERDI at WCCW that males with more seniority would have been able to stay. So you're saying there's someone at McNeil that could have gone over there? I don't think that would be disputed. Okay. Thank you. All right. We'll hear from the other side. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I am Deputy Solicitor General Peter Gonick, representing the Washington Department of Corrections, along with my colleague, Ohad Lowy. I'd like to reserve four minutes of time for interveners to address the Court. In order to fulfill its essential functions of security and protecting the safety and privacy of inmates, the Department undertook an exhaustive review of its staffing and ultimately determined that designating staff in certain correctional officer positions as female only was reasonably necessary. The trial court correctly dismissed the Teamsters lawsuit, and this Court should affirm that the Teamsters have failed to show any Title VII injury and therefore failed to establish standing, that the Department is entitled to deference because its decision was the result of a reasoned decision-making process, and that the ultimate decision to designate these positions as female only was reasonably necessary. Well, what about the last point that I was talking with Mr. Thal about, the displacement of the male correctional officers from McNeill who otherwise would have been able to bump the female correctional officers at Purdy or maybe the other, what is it, Mission Creek at Belfair with lesser seniority? There is discussion in the record in the deposition testimony of Douglas Cole regarding that issue, and no names, as Judge McKeown observed, no names were ever discussed with respect to that discussion, so there's no identified Teamsters members who suffered that, and Doug Cole's testimony was that when McNeill closed, there were people who were given layoff options, and the designation of these positions as female only could have had an impact on some of those, but what those layoff options were was not discussed, and again there are no specific members in the record discussed with respect to the fact that a person had an adverse employment action. In other words – But do we have enough? There's 110 positions here that are in flux because they can only be filled by women. Is that enough of an allegation because it doesn't, you know, take a great leap to conclude if that number is blocked out that there will be some less opportunities for the male guards? I agree, Your Honor, that that information would show that it was possible or maybe even likely that officers had a different impact if those designations were not in place, but the Teamsters didn't introduce any evidence that in fact that did happen. Well, and it wasn't 110, right? As I understand the record, they only object to about 45 or so, so roughly half. I believe it's 66 that they're objecting to, Your Honor, 45 at the Washington Correctional Center for Women. That's correct, Your Honor, and the record in fact does show that nobody lost their job as a result of these, even including if you want to address the more attenuated circumstance of McNeil Island closing, even if the court were inclined to hold that that was not too attenuated and that, in fact, the designation of these positions as BFOQ could be causally linked to that, nobody lost their job because of the closure of McNeil Island and these BFOQ designations. And how do we know that? That's in the deposition testimony of Douglas Cole, Your Honor. That's Mr. Cole's testimony? Yes, and he did say that people were. He was saying that even though one might think there could be displacement because of shutting down McNeil Island, that because of his testimony and the lack of any name of someone who actually did lose their job that basically there's no evidence that anyone lost their job. That's correct, Your Honor, and that's what the district court found as well, that the Teamsters had failed to introduce any evidence that any of its, any specific members of the Teamsters had suffered an injury. And with respect to the names that were mentioned by my colleague, if you look at ER 630, as Your Honor has apparently done, there are two names that are mentioned, and they're mentioned as names on a document that, as far as I know, is not part of the record. But even if the court were to determine that the mention of those names sufficiently ties it to a document that purports to be letters telling people that you've been displaced from your position, there's further deposition testimony, and that is at supplemental excerpts of the record 103 to 105, that those six officer positions that were displaced were offered as a result of that displacement positions on the same shift, with the same days off, at the same pay. And that is the kind of action that the Rubino court determined was not sufficient to establish a Title VII injury. So to the extent that there might be any loss at all, it would be what, lost over time had they received, been able to receive a more, I'll call them favorable position? And again, Your Honor, there is the possibility that they lost over time, and that is discussed in the record, that there's the possibility of loss over time, but there's no evidence of any member that did, in fact, lose over time. What about the relocation costs to eastern Washington? There's no evidence in the record to the district court about any required relocations. And that's why the district court held that they had not established any injury and why we feel this case is being dismissed. Well, I mean, it's kind of a, it's like being on a Mobius strip, whether it's a failure to establish the Title VII violation or whether it's actually standing because you need injury, in fact, by someone to bring a case. So, you know, these, standing often gets into the merits. But your position is that there's no individual identified that would meet the criteria, either for standing or for actually showing injury. Is that right? That's correct, Your Honor. That's our position. And I do also want to take a few minutes to address the recent decision that this court issued in AMBAT, because that decision forcefully demonstrates why the department here is entitled to deference. In that case, the court determined that the San Francisco sheriff had not engaged in a sufficient review and a sufficient analysis to be entitled to deference, but virtually everything that the court discussed that the San Francisco sheriff should have done, the department did here and more. The department engaged consultants. They fully investigated and determined exhaustively the extent of the misconduct at issue here. They had the three independent consultants' reports. They relied on their own decades of administrator experience. They looked to the experience of other states. They contacted administrators in other states. They talked to the staff and, ultimately, recognizing, the department recognized that this was a very serious decision, that it could affect the employees, and they took the additional step that, as far as I know from any of the reported cases, none of the other administrators had done, and that was to ask the state agency that is charged with upholding the rights of against gender discrimination to examine their decision independently. And the Human Rights Commission, it's an independent state agency. Their mission is not to address prison security or to have the administrators back. Instead, they did an independent investigation. It took nine months. They went. They visited the prison. They interviewed staff. They did statistical calculations, and they looked at these positions individually on an individual basis and ultimately determined that, yes, the department was correct in determining that these should be designated as female only. And there were several reasons for that. The misconduct has been discussed, but equally important are the privacy and search issues. As a result of this Court's opinion in Jordan v. Gardner, it's unquestioned that male correctional officers cannot conduct either pet searches or strip searches of female inmates except in emergency circumstances. There's a deposition testimony again from Mr. Cole that those emergency circumstances almost never exist. In fact, he couldn't recall a single instance in which the correctional officers had determined that an emergency existed such that a male correctional officer could do a search of a female offender. And the lack of female officers in these positions that the department had requested bona fide occupational qualifications for led to a number of problems over the years. There were escapes. There were the searches that were required by policy were not being done. The random searches were simply not being done at all, and the inmates were able to adjust their behavior accordingly. The escape occurred when, at least one of the escapes, occurred when the inmate was going out on a work crew, and the inmate had a reasonable expectation, based on the past, that she was not going to be searched before going out. The officer, the male correctional officer who knew that these offenders should be searched before leaving, held the work crew up and called for a female correctional officer to come, but there were none available. And he waited for as long as he could, and then ultimately he let them go. The offender had street clothes on underneath her clearly identifiable prison clothes and was able to escape by going into a women's restroom on that work crew. So there's a concrete logical basis. There was a basis, in fact, for the designation of these positions as female only. And it's not just the misconduct. That certainly was one of the reasons, the justifications that the department used, but there was also the searches and, as Judge Tolman referred to, the privacy issues. The issue of the fact that there were also men in the higher custody units and that, therefore, there didn't need to be a woman there or some suggestion that perhaps the department's reasoning was inconsistent is not true because, as the department explained, there needs to be a woman at all times on the unit for two reasons. One is in case there is some reason to go into the shower area, to go into the area where inmates are undressed, some reason to suspect there needs to be a female available for that. There also needs to be a female available for pat searches or suspicion searches. And the problem with having only male on the shift is that the offenders know that there are only male correctional officers on the shift, and they know that male correctional officers, even though they do do the room checks and they do go through the unit, they have to announce themselves before doing so. They say, man on the unit or man on the tier. And so, again, the offenders, the inmates, can adjust their behavior accordingly. I see that my time is up, and so I don't want to go any further into interviews. Good morning, Your Honor. Your Honors, my name is Nick Straley. I'm along with Melissa Lee. We represent the class of female inmates at the women's prisons. Your Honors, this case is not about gender stereotypes. It's about undisputed facts. The undisputed facts are that our clients, the vast majority, come to prison with a particular history, a history of domestic violence and abuse committed against them by close, intimate men, by fathers, by husbands, by boyfriends. That is in the record, and that is undisputed. That history leads towards the type of conditions that put people in prison, mental health disorders, chemical dependency. The very reasons the women are behind bars is because of that abuse in many, many cases. This history also renders women likely to be preyed upon by unscrupulous male correctional officers, more likely to attempt suicide or injure themselves, and particularly sensitive to invasion of privacy by male correctional officers. The undisputed evidence in the record shows that on many shifts before the BFOQs, in many of the housing units, there were no women posted at all. It was only men supervising women in the shower, supervising women in the bathrooms, supervising women when they were getting dressed. Only men. That era, as Your Honor discussed, saw a large extent of staff sexual misconduct, self-harm, and serious physical injury or psychological injury, and that's contrasted to the lack of evidence in the record with respect to the men here. The Teamsters concede that the minimum security units, it's appropriate to have at least one woman posted in each of the minimum security units. And as you may recall, Your Honors, that means that at Mission Creek, it is a minimum security facility, and so all of the BFOQs at that facility are legitimate by the Teamsters on admission, as are all of the minimum security units at WCCW. The only disputes are with respect to the higher security units, and those higher security units are essential to have women on staff, as Mr. Gonnick mentioned, for the pat search needs, for the search needs, which this Court has always recognized would be a cruel and unusual punishment if you allowed men to regularly pat search women, and because of the nature of the individuals who are located there in those higher security units. You have women who are acting out because of mental health disorders, because of behavioral disorders. The record demonstrates that oftentimes those are hyper-sexualized behaviors, and the need for women to be present at those places is particularly acute, if not more so than in the minimum units. And as the record shows, sexual assault occurred in all units on all shifts. In addition, even if you put aside the issue of sexual misconduct, the privacy needs alone justify the BFOQ posts in this case. It is undisputed that in the year before the BFOQ posts, 20 women attempted suicide. Primarily and significantly because only men were supervising them. They would secrete themselves in the bathrooms, they would secrete themselves in the showers, and they did that because they knew that men were only supervising and were unlikely to come observe them. Having a woman on shift, as the undisputed testimony of Alex Payne discusses, means that there can be regular interventions in bathrooms, regular interventions in places where women are getting dressed, using the toilet, taking a shower. These are all legitimate and sufficient basis to support the BFOQs. And the injury, again, when you consider the two types of injuries, the evidence is overwhelming that DOC properly considered the severe injury to the vast number of women versus the unproven and undocumented injury to a few men to sit the post that they see fit. Your Honors, thank you very much. Thank you. You've used your time, but we're going to give you a little extra time because we took up a lot of time in questioning, so why don't you put a minute and a half back on the clock. Thank you. That's the right time to do, thank you. Put two. Thank you, I'll use every second of that. We don't like to split hairs here. Okay, I'm going to try and cover both standing and the merits as quickly as possible. First on standing, the issue that you've already discovered is that at ER 630 and 631, individuals are identified. The standard under Thompson does not require that someone actually lost a job. That's not the only possible economic injury. There's numerous pieces of evidence with respect to that. In terms of standing itself, lob is controlling here. In terms of the allegations of standing and the complaint, they're clearly sufficient to establish standing. But getting to the affidavits that have been provided to you, they identify numerous other injuries, and there is Ninth Circuit authority that you can find at pages 12 through 13 of our brief that warrants the consideration of those supplemental affidavits. Turning now to the issue of the privacy issue that was raised during the course of the last discussion, the statement was made that there were situations where they were the only male CO on the shift. That is absolutely not correct. We aren't talking about an entire shift where it's all males. What we're talking about is the situation in the housing units where there were two or more officers and the first is female. And with respect to that issue – So are you arguing that men should be assigned without female correctional officers in those units? No. See, and that also is the problem here. It's not that by designating something as not BOQ, it's automatically going to be a male filling that position. It's just that it's not limited to females. But it seems to me that the logical conclusion to your argument is that there would be times when men only would be assigned to the housing unit. It can happen. But the test in AMBAT that this Court established in July of this year – But how does that address the problem that brought us here? It makes it clear that – Mr. Fall? I'm answering your question. That the standard isn't about convenience. It's not about whether it's – It's not a question of convenience. It's a question of privacy and security. No. There is no question that there are females on shift in response to his statement. There are female correctional officers on shift. You are not dealing with a situation where there's no one who's capable of performing a specific task. Well, we might have a male officer only in the housing unit, but if he needs to enter one of these sensitive areas, he's going to have to call a roving officer who's female or maybe displace an officer from another post in a different part of the prison, and who knows how long it's going to take. And then we're going to leave that post vacant. The law requires that the BFOQ designation must be narrowly tailored to meet the necessity, not convenience. If we were – Isn't that where we have some deference? Because, you know, we can't sit here and figure out, well, it's not a question of convenience. That's necessity of moving an officer around, middle of the night, single male there, but we need a female. I mean, that's not a judgment the court makes, and isn't that why – that's where AMBIT talks about deference. AMBIT and Bryner talk about deference where you aren't being driven by a consideration that is based in stereotype and hunch and instinct. And our point is that that decision-making process that occurred here at the Department of Corrections was based on that at the time that the decision was made. It was based on what? I mean, your opponent says AMBIT is distinguishable because we did everything here that the Ninth Circuit criticized the sheriff for not doing there. So what more would you have the Department of Corrections do before reaching the same conclusion? The Department's policy that having the first woman on a housing unit essentially as a babysitter to the male officer is saying that the qualification that's important is the ability to restrain from sexual abuse and the ability to report and restrain others from doing it. And my point is that that standard is based on a stereotype or an instinct and hunch that finds no support in the record. There's no support to establish that. You can say no support in the record, but then you ignore the consultant's reports and the Human Rights Commission. They do not say that. They do not say that there is evidence. That it's important to have female officers in those units? There's that assertion at ER 727, but if you try to look deeper to find what is the basis for the what is the evidence, the objective standard. Remember, AMBIT requires. So what do you want? Do you want a federal judge looking at each one of these positions and substituting our judgment for the determination of the prison administrator as to whether or not this is a bona fide qualification? Is that what you want? That's what I want when there's evidence in the record, which there is, that the judgments of those prison administrators were not rooted in evidence. So you want a trial position by position is what you're asking for on remand? On remand, we're asking for reversal of the summary judgment on both points. Because there are contested. And you would go to trial, and what would happen? There are contested issues of fact. As to each position? As to each position that's in dispute, because. How many are there? How many positions would that be? Okay. So at WCCW, the department designated 66 positions out of 164. We challenged 45 of those. At Mission Creek, the department designated 18 positions out of 32. We challenged 14 out of 18 of those. So in your view, we'd have a trial on 45 plus 14, and each position would be basically microscopically examined as to the correctional basis for the determination? Some of those positions are similar or, in some cases, identical. So you have categories of positions. There are the housing units. There's the programs and activity positions. There's the work crews. Those are sort of the three overarching categories. I'm trying to envision what this trial would look like. You would call your own correctional experts who would counter the correctional experts that the state has already hired, and then the judge or the jury would have to decide which expert to believe in justifying the prison administrator's decision. Is that what you envision? That's a piece of it. I mean, this court has held that these are very fact, nuanced analyses that are well suited for resolution on summary judgment because they are so fact dependent, they depend upon so many different elements. And as you change the equation of the institution as a whole, as we conceded R&M positions and so forth, now the number situation is different. And the point is that we can't go back to a world in which decisions are made based on stereotype and hunch and instinct. We have to have fact-based determinations as to necessity for the position. Okay, I think unless there's more questions, I think we have your argument in mind. Thank you. I really appreciate that. Thank you. The argued Teamsters v. the Washington Department of Corrections is submitted. I'd like to thank all counsel for your arguments this morning, and we're adjourned.
judges: Hawkins, McKeown, Tallman